IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| Mitchell and Laura Putnam, | C/A No. 2:09-CV-1740-MBS |
| Plaintiffs, | |
| vs. | **OPINION AND ORDER** |
| Alea London Limited, | |
| Defendant. | |

This declaratory judgment action arises out of the 2005 construction of Mitchell and Laura Putnam's ("Mr. Putnam" and "Mrs. Putnam," together, "Plaintiffs") modular home in Dorchester County, South Carolina. See Compl. ¶ 6, ECF No. 1. Plaintiffs maintain that Defendant Alea London Limited ("Defendant" or "Alea") is liable for a consent judgment agreed to by KLM Enterprises ("KLM"), the general contractor that constructed Plaintiffs' home, as part of a settlement of a state court action between Plaintiffs and KLM. See id. at ¶¶ 17–25. Plaintiffs and Defendant both filed motions for summary judgment. Def.'s Summ. J. Mot., ECF No. 25; Pls.' Resp. & Cross-Mot., ECF No. 27. The Court heard argument on January 13, 2011 and, at the conclusion of that hearing, GRANTED Defendant's motion for summary judgment, ECF No. 25, and DENIED Plaintiff's motion, ECF No. 27. This order sets forth the Court's reasoning.

I.  **BACKGROUND**

In or around early 2005, KLM purchased the home that is at the center of this litigation from Haven Homes, a company in the business of selling modular homes. Sometime shortly thereafter,

1

Plaintiffs entered into an agreement with KLM for the purchase and construction of the home.[1]  It is undisputed that, once KLM finished construction, there were major problems with the home.  The record is rife with allegations about what went wrong, but at his deposition, Mr. Putnam focused on one particular long weekend that saw, what Mr. Putnam described as, "a monsoon [that lasted] for about three or four days."  Putnam Dep. 8:6–7, ECF No. 25-18.  Before KLM left for that weekend, Mr. Putnam claims they explicitly assured him that the newly erected roof "was dry, and it wouldn't matter if it rained[.]"  Id. at 8:1–16.  However, that turned out not to be the case, and the rain that followed "soaked all of the sheetrock[,] . . . [and] flooring[, and resulted in] mold growing on the walls."  Id. at 8:6–7, 22–25.  In an affidavit submitted in connection with these cross-motions for summary judgment, Mr. Putnam avers that, "[a]ll of the major damage to [the] residence arose as a result of the problems with the roof[.]"  Putnam Aff. ¶ 2, ECF No. 27-1.[2]

The City of North Charleston issued a Certificate of Occupancy on November 7, 2005 and Plaintiffs moved into the home in December 2005.  See Certificate of Occupancy/Completion, ECF No. 25-14 at 2; Putnam Dep. 17:8–13, ECF No. 25-18.  On March 24, 2006, KLM filed suit against Plaintiffs in the Court of Common Pleas for Charleston County seeking $36,108.75 for work that

---

[1]  The Complaint alleges that Plaintiffs were the original purchasers of the home, but the settlement documents state that KLM purchased the home from Haven Homes and then resold it to Plaintiffs.  See Compl. ¶ 6, ECF No. 1; Settlement Agreement 2, ECF No. 1-2 at 2.  At the hearing, Plaintiffs' counsel clarified that KLM purchased the home from Haven Homes and then entered into an agreement with Plaintiffs under which KLM would construct the home and Plaintiffs would purchase the home from KLM.

[2]  Mr. Putnam also testified about other problems with the home that are seemingly unrelated to issues with the roof.  For instance, he advised that when he and his family moved into the house in December of 2005, the home simply "wasn't finished": there was no trim up and the flooring had not yet been installed.  Putnam Dep. 17:14–20, ECF No. 25-18.

2

KLM claimed had gone uncompensated (the "State Court Action").³ State Ct. Compl., ECF No. 25-2 at 2–8. Plaintiffs responded by counterclaiming for breach of implied warranty of workmanlike service, negligence, unfair trade practices, breach of contract, warranty of merchantability, negligence per se, and fraud and misrepresentation. See Pls.' State Ct. Answer & Countercl., ECF No. 25-3.

Defendant came to be involved in this matter by virtue of its role as KLM's insurer, under Commercial General Liability policy number ALT 042969 (the "CGL Policy" or the "Policy"). See CGL Policy, ECF No. 25-15. KLM first notified Defendant of the State Court Action on August 3, 2007, by letter from its counsel Jennifer L. Queen. Ms. Queen enclosed the relevant pleadings from the State Court Action and requested Defendant's determination as to defense and coverage. See Letter from Jennifer Queen to Alea (Aug. 3, 2007), ECF No. 25-3. After reviewing the pleadings, Defendant's counsel Peter Dworjanyn informed Ms. Queen that it was Defendant's determination that the CGL Policy "does not provide coverage for the counterclaims, and therefore Alea will not be participating in the defense or indemnification of this claim." Letter from Peter Dworjanyn to Queen (Dec. 10, 2007), ECF No. 25-4.

Approximately four months later, the South Carolina Supreme Court decided Auto Owners Ins. Co., Inc. v. Newman, No. 26450, 2008 WL 648546 (S.C. Mar. 10, 2008). Believing that the Newman decision impacted Defendant's coverage decision, counsel for each of the parties to the State Court Action (Plaintiffs, Haven House, and KLM) wrote letters to Mr. Dworjanyn requesting that Defendant reconsider its denial of coverage. See Letter from Jeffrey J. Wiseman to Dworjanyn

---

³   Haven Homes was also named as a defendant in the State Court Action. See State Ct. Compl. 1, ECF No. 25-2.

(Mar. 18, 2008), ECF No. 25-5; Letter from Steven Smith to Dworjanyn (Mar. 19, 2008), ECF No. 25-6; Letter from Queen to Dworjanyn (Apr. 4, 2008), ECF No. 25-7.[4]

In December 2008, Mr. Dworjanyn received a letter from Douglas E. Leadbitter, an attorney representing KLM, again requesting that Defendant reconsider its denial of coverage. See Letter from Douglas E. Leadbitter to Dworjanyn (Dec. 23, 2008), ECF No. 25-8. When Mr. Dworjanyn responded to Mr. Leadbitter, he noted that he was "under the impression" that the parties had since filed amended pleadings that he had not yet reviewed; Mr. Dworjanyn requested that KLM provide him with any such amended pleadings "immediately." Letter from Dworjanyn to Leadbitter (Jan. 8, 2009), ECF No. 25-9. The requested documents were provided to Mr. Dworjanyn on January 13, 2009 and, on February 10, 2009, Mr. Dworjanyn informed KLM's counsel that Defendant would undertake KLM's defense in the State Court Action under a forthcoming reservation of rights. See E-mail from Jennifer Anderson, paralegal, to Dworjanyn (Jan. 13, 2009), ECF No. 25-10; E-mail from Dworjanyn to Leadbitter (Feb. 10, 2009), ECF No. 25-12.

Alea assigned attorney Tom Hesse to defend KLM in the State Court Action. Six days later, Mr. Hesse informed Mr. Dworjanyn that the State Court Action had been settled. See Letter from Dworjanyn to Smith & Leadbitter (Feb. 16, 2009), ECF No. 25-13. On that same day, Mr. Dworjanyn sent a letter to counsel for Plaintiffs and KLM in which he summarized his understanding of the sequence of events and the current status of the action and requested that he be provided with a copy of any settlement documents (the "February 16th Letter"). Id. at 1–2. In fact, when Mr.

---

[4] In the meantime, the South Carolina Supreme Court granted a motion for rehearing in the Newman case and the original decision, issued in March of 2008 in a slip opinion, was never officially released. Following rehearing, a substituted opinion was eventually issued on September 8, 2009. See Auto Owners Ins. Co., Inc. v. Newman, 684 S.E.2d 541 (S.C. 2009).

4

Dworjanyn wrote the February 16th Letter, the State Court Action had not yet settled, but neither KLM nor Plaintiffs informed Mr. Dworjanyn of this fact. Instead, they continued with settlement negotiations.

Plaintiffs and KLM ultimately executed a "Settlement Agreement Release And Assignment" on March 10, 2009 (the "Settlement Agreement"). See Pls.' Resp. To Def.'s Interrogs. ¶ 8, ECF No. 25-17; Settlement Agreement 6, ECF No. 1-1. Under the terms of the Settlement Agreement, KLM agreed to execute a confession of judgment in favor of Plaintiffs in the amount of $150,000, and to

> assign[] all of its rights and interests to any causes of action or recovery that KLM might have against Alea Insurance Company, its successors or assigns, or any other person, entity, or corporation providing insurance coverage to KLM, for matters and claims arising out of this action or arising out of any claims brought by [Plaintiffs] or on behalf of any damage to or defective construction or workmanship in the construction of their residence . . . .

Settlement Agreement 2, ECF No. 1-1.

On March 24, 2009, Plaintiffs' counsel sent Defendant a demand letter requesting that Defendant pay the $150,000 consent judgment within thirty days. Letter from Smith to Dworjanyn (Mar. 24, 2009), ECF No. 1-3. After Defendant refused, Plaintiffs filed the instant action. See Compl., ECF No. 1.

## II.    LEGAL STANDARD

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). There is no genuine dispute of material fact when the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party under the applicable law. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). When faced with cross-motions for

summary judgment, the court "must review each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003) (quoting Philip Morris, Inc. v. Harshbarger, 122 F.3d 58, 62 n.4 (1st Cir. 1997)).

### III. ANALYSIS

Defendant argues that it is entitled to summary judgment because the Policy does not cover Plaintiffs' loss. In the alternative, Defendant argues that, even if the Policy could be read to cover Plaintiffs' loss, the Settlement Agreement is unenforceable against Defendant because (1) it does not comply with the Policy's consent-to-settle provisions; (2) it is patently unreasonable; and (3) KLM's assignment of its rights under the Policy was invalid per the Policy's anti-assignment provision. For the reasons discussed below, the Court finds that the Policy does not cover Plaintiffs' loss, but even if it did, the Settlement Agreement is unenforceable against Defendant under the Policy's own terms. The Court need not and does not reach Defendant's other arguments.

#### A. The CGL Policy.

The parties agree that the CGL Policy is governed by South Carolina law, under which insurance agreements "are subject to general rules of contract construction." Fritz-Pontiac-Cadillac-Buick v. Goforth, 440 S.E.2d 367, 369 (S.C. 1994). Plaintiffs bear the burden of proving that their loss falls within the coverage afforded by the CGL Policy, while Defendant bears the burden of establishing exclusions to coverage. Boggs v. Aetna Cas. & Sur. Co., 252 S.E.2d 565, 568 (S.C. 1979); Gamble v. Travelers Ins. Co., 160 S.E.2d 523, 525 (S.C. 1968). Questions concerning the construction of a written contract are questions of law suitable for resolution on summary judgment if the language employed by the contract is plain and unambiguous. Moss v. Porter Bros., Inc., 357

S.E.2d 25, 27 (S.C. 1987) (citing First-Citizens Bank & Trust Co. v. Conway Nat'l Bank, 317 S.E.2d 776, 777 (S.C. Ct. App. 1984)). The Court "must give policy language its plain, ordinary, and popular meaning . . . [and] cannot torture the meaning . . . to extend coverage not intended by the parties." S.C. Farm Bureau Mut. Ins. Co. v. Dawsey, 638 S.E.2d 103, 104–05 (S.C. Ct. App. 2006). Ambiguous or conflicting terms are to be "construed liberally in favor of the insured and strictly against the insurer." Diamond State Ins. Co. v. Homestead Indus. Inc., 456 S.E.2d 912, 915 (S.C. 1995).

The policy was effective from July 19, 2004 at 12:01 a.m. through July 19, 2005 at 12:01 a.m. CGL Policy, ECF No. 25-15. Under its terms, Defendant agreed to "pay those sums that the insured [KLM] becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage'" that is "caused by an 'occurrence' that takes place in the 'coverage territory'; and . . . [t]he 'bodily injury' or 'property damage' occurs during the policy period." CGL Policy § I.1, ECF No. 25-15 at 22. "Property damage" is defined as

    a.    Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

    b.    Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

Id. at § V.15. An "occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Id. at § V.12.

The Policy has several explicitly stated exclusions, including an exclusion for property damage done to:

That particular part of real property on which you or any contractors or

>> subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or
> . . . .
> That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

Id. at § I.2.j.(5)&(6) (the "faulty workmanship exception").[5] If, however, property "must be restored, repaired or replaced because 'your work' was incorrectly performed on it," the "products-completed operations hazard" provision effectively restores coverage for

> all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:
>
> (1)   Products that are still in your physical possession; or
> (2)   Work that has not yet been completed or abandoned. . . . "[Y]our work" will be deemed completed . . . [w]hen all of the work called for in your contract has been completed.

Id. at § V.14.

The Policy also contains two important limitations specific to Defendant's liability for settlements of claims against KLM or by a third party under the Policy. Under the first, KLM agreed that it would not, except at its own cost, "voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without [Defendant's] consent." Id. at § IV.2.d. Under the second, Defendant agreed that

> A person or organization may sue us to recover on an <u>agreed settlement</u> or on a final judgment against an insured obtained after an actual trial . . . . <u>An agreed settlement means a settlement and release of liability signed by us,</u> the insured and the claimant or the claimant's legal representative.

---

[5]   "Your work" is defined as "[w]ork or operations performed by you on your behalf" and "[m]aterials, parts or equipment furnished in connection with such work or operations," expressly including "[w]arranties or representations made at any time with respect to the fitness, quality, durability, performance or use of 'your work[.]'" CGL Policy § V.19, ECF No. 25-15 at 32.

8

Id. at § IV.3 (emphasis added).

> **B.    The CGL Policy's Faulty Workmanship Exception Excludes Coverage In This Case.**

Pursuant to the South Carolina Supreme Court's decision in Century Indemnity Co. v. Golden Hills Builders, Inc., 561 S.E.2d 355 (S.C. 2002), the Court finds that Plaintiffs' claims for coverage are excluded by the plain language of the CGL Policy.[6]  Briefly, Golden Hills involved a federal declaratory judgment action brought by an insurer against its insured, a general contractor engaged in the business of constructing residential homes, and the appellant-homeowners, who had alleged in a South Carolina state court action that "their home was defective because a subcontractor of the [i]nsured constructed the synthetic stucco exterior of the home in a manner that caused moisture damage to the properly constructed substrate and framing of the house." Id. at 356.  The federal district court granted the insurer's motion for summary judgment and the homeowners appealed.  The Fourth Circuit then certified several questions to the South Carolina Supreme Court, all related to the scope of the policy's coverage.  Id.  One of the questions that the South Carolina Supreme Court considered was whether the CGL policy's faulty workmanship provision precluded the claim from coverage.  Id. at 358.  The Court affirmatively found that damage caused to other

---

[6]  Plaintiffs argue strenuously that because Golden Hills predates the South Carolina Supreme Court's decision in Auto Owners Insurance Co., Inc. v. Newman, 684 S.E.2d 541 (S.C. 2009), Golden Hills is no longer good law.  Newman, however, was effectively overruled by Crossman Communities of North Carolina, Inc. v. Harleysville Mutual Insurance Co., No. 26909, slip op. at 49 (S.C. Jan. 7, 2011).  Moreover, even to the extent that Newman remains good law, Plaintiff's position that Golden Hills was overruled by Newman is contradicted by Newman itself, which expressly distinguished Golden Hills in a footnote that explained that Golden Hills addressed a different situation in which "the coverage period for the policy at issue expired while the contractor was still in possession of the home." Newman, 684 S.E.2d at 545 n.2.  This is precisely the situation at issue in the instant case.

parts of the home as a result of the contractor's negligence was excluded by the faulty workmanship provision. Id. Next, the Court considered whether, "[i]f the coverage is precluded by the faulty workmanship provision, is that coverage restored by a provision that provides coverage for damage arising from products-completed operations hazards?" Id. at 360. The Court found that coverage was not restored by this provision, because "[t]he work [for which the contractor had been retained] clearly had not been completed at the end of the policy period." Id. at 359.

Plaintiffs' claims are foreclosed by the analysis in Golden Hills for several reasons. First, Plaintiffs seek coverage for exactly the kind of loss that is not intended to be covered by a CGL policy—that is, loss caused by a contractor's negligent fulfilment of its contractual duties. See id. at 358 (finding that the limited purpose of CGL policies is to provide coverage "for tort liability for injury to persons and damage to *other* property and not for contractual liability of insured for economic loss because completed work is not that for which the damaged person bargained") (citing Sapp v. State Farm Fire & Cas. Co., 486 S.E.2d 71, 75 (Ga. Ct. App. 1997)) (emphasis in original); see also Putnam Aff. ¶¶ 2, 4 ("All of the major damage to my residence arose as a result of the problems with the roof," and "[t]he installation and completion of the roof was one of the specific contractual duties of [KLM] which was to provide a turn-key, completed residence"), ECF No. 27-1. The faulty workmanship exception contained in the CGL Policy is substantially similar to the one at issue in Golden Hills and, as in that case, it excludes coverage for this type of loss.[7] See Golden

---

[7] This conclusion is further supported by Golden Hills' approving citation to a Georgia Court of Appeals' decision, Bituminous Cas. Corp. v. Northern Ins. Co. of New York, 548 S.E.2d 495 (Ga. Ct. App. 2001), which involved claims markedly similar to those at issue in this action. See Golden Hills, 561 S.E.2d at 359. In Bituminous, the homeowners sought recovery under a CGL policy for damage caused during the construction of their home as a result of the contractor's failure to protect a deck attached to the home during a rainstorm. 548 S.E.2d at

Hills, 561 S.E.2d at 358. Second, the record demonstrates that KLM continued working on the home beyond the CGL Policy's expiration date, see id. at 359–60; therefore, as in Golden Hills, Plaintiffs' claims are not saved by the products-completed operations hazards provision.

In an attempt to avoid dismissal of their claim, Plaintiffs submit an affidavit from Mr. Putnam averring that "[a]ll of KLM's work, and all of the work leading up to and causing the problems with the residence, was completed by KLM before July 19, 2005, and the entire project was totally abandoned by KLM before July 19, 2005." Putnam Aff. ¶ 11, ECF No. 27-1. This affidavit, however, contradicts Mr. Putnam's deposition testimony that KLM continued working to fix the problems in the home until at least September 2005 and did not abandon the project until approximately November 2005. See Putnam Dep. 60:14–20, ECF No. 25-18. Defendant correctly argues that Plaintiffs cannot create an issue of material fact at summary judgment by submitting affidavits that contradict their own sworn testimony. See, e.g., Erwin v. United States, 591 F.3d 313, 325 n.7 (4th Cir. 2010) ("[I]t is well established that '[a] genuine issue of fact is not created where the only issue of fact is to determine which of the two conflicting versions of [a party's] testimony is correct.").

To the extent that Plaintiffs intended to argue that the Court should view the completion of the roof as the date of "completion" for purposes of Plaintiffs' loss, that argument is also foreclosed by Golden Hills. There, the homeowners similarly argued that the products-completed operations hazards provision

---

496. Because of the contractor's negligence, "water inundated the house, allegedly causing $165,000 in damages." Id. The Bituminous court found that the homeowners' loss was excluded by the CGL policy's faulty workmanship exclusion. Id. at 497.

> should be interpreted to mean that upon the completion of each *activity,* coverage would be extended to that activity. For example, once the plumbing was completed, coverage would be extended to that part that had been completed, *i.e.*, the plumbing.

Id. at 360 n.5 (emphasis in original). The South Carolina Supreme Court rejected this reasoning, finding that "the plain language of the policy contradicts such an interpretation," because "[t]he policy provision clearly states, 'When *all* of the work called for in your contract has been completed.'" Id. (emphasis in original). By Mr. Putnam's own testimony, KLM had not completed all of the work that it was contracted to do by the end of the Policy's term.

### C. KLM's Violations of the CGL Policy's Consent-to-Settle Provisions Rendered the Settlement Agreement Unenforceable Against Defendant.

Alternatively, the Court finds that, because KLM failed to comply with the CGL Policy's conditions that required that Defendant consent to any settlement of Plaintiffs' claims, the Settlement Agreement is unenforceable against Defendant. See Puckett v. State Farm Gen. Ins. Co., 444 S.E.2d 523, 524 (S.C. 1994) (holding that where an insurance contract requires as a condition of coverage that the insured cooperate with the insurer, "an insured's failure to cooperate may bar *recovery* under a policy where the insurer can show prejudice therefrom") (emphasis in original). The Policy requires KLM to first obtain Defendant's consent before it, "voluntarily make[s] a payment, assume[s] any obligation, or incur[s] any expense, other than for first aid," CGL Policy § IV.2.d, ECF No. 25-15 at 28, and permits third parties to sue Defendant to recover on settlements only where Defendant itself agreed to the settlement. Id. at § IV.3.

Plaintiffs make several arguments as to why these provisions should not bar their claims, but none are persuasive. First, in their briefing, Plaintiffs repeatedly insist that by agreeing to defend KLM under a reservation of rights, Defendant "conceded . . . that coverage did exist." Pls.' Resp.

12

& Cross-Mot. 13, ECF No. 27.[8] The Court disagrees. See, e.g., Laidlaw Envtl. Servs., Inc. v. Aetna Cas. & Sur. Co., 524 S.E.2d 847, 852 (S.C. Ct. App. 1999) (rejecting insured's argument that insurer waived its rights to refuse coverage and withdraw representation where insured agreed to provide coverage and defense under a reservation of rights). Second, Plaintiffs argue that they are not constrained by the Policy's consent-to-settle requirements because they are merely "an innocent third party beneficiary" to the agreement. Pls.' Resp. & Cross-Mot. 17, ECF No. 27. The law of assignment, however, makes Plaintiffs subject to the same defenses that KLM would have had if it had sought payment for Plaintiffs' losses from Defendant itself. See, e.g., Dixie Wood Preserving Co. v. Albert Gersten & Assocs., 135 S.E.2d 368, 371 (S.C. 1964) ("The general rule is that the assignee of a non-negotiable chose in action takes it subject to all equities and defenses which could have been set up against the assignor at the time of the assignment.") (citing Patten v. Mut. Ben. Life Ins. Co., 6 S.E.2d 26, 30 (S.C. 1939)).[9]

Finally, Plaintiffs argue that Defendant cannot show that it was prejudiced by KLM's failure

---

[8]     See also Pls.' Resp. & Cross-Mot. 8, ECF No. 27 ("[A]t some point between the time of the initial notification by KLM of the filing of a complaint against it . . . and the settlement of the underlying case, Defendant Alea conceded that the complaint set forth issues that, as it now put it, 'could allege 'property damage' caused by 'an occurrence' and would consequently give rise to coverage[.]'"); id. at 20 ("[Defendant initially] denied coverage, finally changing its mind and determining, late in the litigation and almost simultaneously with the agreement of the parties to settle the action, that coverage did exist.").

[9]     Furthermore, given the particular facts of this case, Plaintiffs' protests that they were merely an "innocent party" to KLM's violations of the consent-to-settle provisions ring particularly hollow. Plaintiffs do not dispute that they received the February 16th Letter advising that Defendant had agreed to defend KLM under a reservation of rights, but was under the impression that the case had settled. Plaintiffs also do not deny that, at the time that Mr. Dworjanyn wrote the February 16th Letter, the State Court Action had not yet been settled and would not settle until almost a month later, on March 10, 2009.

to comply with the Policy's consent-to-settle provisions because Defendant had been aware of the suit's existence since December 2007, but did not decide to defend KLM until February 2009. But Plaintiffs themselves acknowledge that their original pleadings in the State Court Action set forth their counterclaims "in extremely broad terms, and . . . alleged the existence of significant damage to [Plaintiffs'] property with little detail," Pls.' Resp. & Cross-Mot. 4, ECF No. 27. It was not until sometime in late June or early July of 2008 that Plaintiffs filed an amended pleading that included specific allegations about damage to Plaintiffs' home. See Pls.' Am. State Ct. Answer, Counterclaim, Cross Claim & Third Party Compl. ¶ 37, ECF No. 25-11 (listing in comprehensive detail alleged defects to the residence including "improper flashing and caulking around windows, crooked shingling of room," "[f]ailure to properly install moisture barrier below house," and "[n]ail holes in water lines causing leaks, which in turn have damaged sheetrock, smoke detectors, and surrounding areas"). Plaintiffs do not dispute that Defendant was not provided with these amended pleadings until January 2009. Nor do Plaintffs deny that they were specifically informed of this fact in the February 16th Letter.

Given this set of facts, the conclusion that Defendant's ability to investigate Plaintiffs' claims as asserted in the amended pleadings was prejudiced by KLM's actions is unavoidable. No more than six days passed between Defendant's decision to defend KLM based on the newly provided amended pleadings and Defendant's discovery that the underlying suit had been supposedly settled. Although this discovery later turned out to be false, neither KLM nor Plaintiffs made any attempt to dissuade Defendant of its belief that the case had already settled; instead, and with full knowledge of Defendant's mistaken belief, KLM and Plaintiffs chose to continue with their settlement negotiations without Defendant's consent or even its involvement.

Defendant has clearly been prejudiced by KLM's entry into a settlement agreement that now has Defendant defending against Plaintiffs' demand for a payment of $150,000—the basis for which amount is set forth in neither the Settlement Agreement or any of the papers that Plaintiffs have filed with this Court.[10] Even were some of Plaintiffs' losses covered by the Policy and Defendant obligated to indemnify KLM for them, Defendant is not obligated to pay any unsubstantiated amount agreed to in settlement negotiations from which it appears to have been purposefully excluded, in violation of the Policy.

## IV.     CONCLUSION

For the reasons stated herein, the Court GRANTS Defendant's motion for summary judgment, ECF No. 25, and DENIES Plaintiff's motion for summary judgment, ECF No. 27.

IT IS ORDERED.

/s/ Margaret B. Seymour
United States District Judge

February 4, 2011
Columbia, South Carolina

---

[10]     In their briefing, Plaintiffs admitted that "[t]here is no doubt but that some of the damages alleged, such as the defective nature of the construction itself, fall outside the scope of insurance coverage." Pls.' Resp. & Cross-Mot. 7, ECF No. 27. Furthermore, at the hearing, Plaintiffs' counsel freely acknowledged that the Policy may not cover all of the loss that was meant to be compensated by the $150,000, but stated that he had not submitted any documentation breaking down Plaintiffs' damages calculation because he believed that matter was best left for a hearing on damages, not the liability issues ordinarily addressed at summary judgment. Plaintiffs' counsel's position ignores that this is an action for declaratory judgment in which Plaintiffs are seeking a court order declaring that Defendant is liable for the entire settlement amount. See Compl. ¶¶ 16, 21–26, ECF No. 1.